## Case No. 14,995.

UNITED STATES v. DRY OX AND COW HIDES.

[2 Int. Rev. Rec. 34.]

District Court, D. Massachusetts. July 15, 1865.

CUSTOMS DUTIES — INVOICE — UNDERVALUATION — FOREIGN DEPRECIATED CURRENCY.

This was an information to enforce the forfeiture of certain hides seized for an alleged violation of the revenue laws of the United States.

The claimants [Pickman & Silsbee], in 1862, imported from Buenos Ayres, by the barque Emma Cushing, a cargo of four thousand two hundred and sixty-one hides, and entered them at the custom house upon an invoice from E. H. Folmar & Co., their Buenos Ayres correspondents. This invoice was made out in the paper currency of Buenos Ayres, and contained the consular certificate for reducing the amount to American currency. They had also received from their correspondents another invoice made out in gold doubloons. The government maintained that the goods should have been entered upon this last invoice, and that, because they were not so entered, the government was defrauded of duties.

The information alleged: 1st. That the hides were invoiced at less than their actual cost, with intent to avoid a part of their proper duty. 2d. That the invoice was made up with intent, by a false valuation, to evade the revenue. 3d. That the invoice was falsely made up with intent to evade the revenue in this: that it represented the hides as bought in paper money, whereas they were in fact bought in gold; that it was well known that by this mode of stating the purchase, as in paper and not in gold, the hides would pay less than their proper duties on entry here, and that this invoice was made up in paper with the intent that this result should follow. The claimants pleaded the general issue.

Upon the trial of the cause, the government showed that Mr. B. H. Silsbee, one of the claimants, upon the arrival of the vessel which brought these hides, entered them at the custom house in Boston, and produced on their entry an invoice from the shipper, E. H. Folmar, of Buenos Ayres, stating the price in the paper money of Buenos Ayres and representing the hides as costing in this currency $345,278 78; that attached to the invoice was a certificate of the United States consul at Buenos Ayres, that twenty-seven paper dollars were equal to one Spanish dollar; and that, upon his entry, the importer had stated the cost of the hides in federal money, in accordance with the rate given in this certificate, at $12,788 07. It was also proved that, shortly after this entry, difficulties arose with reference to importations from Buenos Ayres, which led to an examination of Mr. Silsbee by the appraisers, and that upon this examination he produced another invoice of these hides, made out in specie, and repre-

senting their cost as $14,376 75, accompanied by a letter from Folmar, in which he spoke of this as "the real invoice," and stated that there was "an advantage in having the invoice for the custom house made out in paper, the consular certificate placing the currency at $27 per Spanish dollar, whereas estimating as worth $16 (fuertes) we would calculate it at about $25 to the hard dollar;" but also saying that our custom house regulation required the invoice to be made out in the paper money; and that this letter and the specie invoice were in the possession of the importer before the arrival and entry of the hides in Boston.

It was also shown in evidence that Buenos Ayres is a province of the Argentine confederacy; that there is in that province paper money issued by the government of the province known as moneda corriente, which is a legal tender for all government dues; is employed in the payment of all the ordinary expenses of daily life, and in the purchase of Mestiza wool for exportation; that it is not received in any other province of the confederation; and that dry and salted hides for export, tallow, and Cordova wool, are always bought and paid for in doubloons.

The claimants on this state of facts contended, as matter of law, that they were obliged by the statute of the United States, requiring all invoices of goods subject to ad valorem duty imported into the United States from any foreign country to be made out in the currency or currencies of the place or country whence they were imported, to have the cost of their hides expressed on their invoice in paper money, even though the purchase was actually made in doubloons. They also contended that the statement of the cost of the hides in the invoice in another currency than that actually employed in their purchase, if the reduction from the one currency into the other be truly made, even though such a reduction would probably effect their entry at less than their actual value, and was made with this intent and for this purpose, was not a violation of the laws of the United States. But on these points the court ruled otherwise, as appears in the instructions to the jury given below; and the claimants then offered evidence tending to show that the United States consul at Buenos Ayres had insisted on having the invoices of all goods exported from Buenos Ayres to the United States made out in paper money, and refused to certify to invoices in which the price was expressed in specie; that the merchants in Buenos Ayres believed the law to require that the invoices should be made out in paper money, and understood the consul to insist upon this being done; and that this was the reason why Folmar made up his invoice in this way; and, in support of this view, they relied much on Folmar's own statement in his deposition, taken in the case, and on a passage in his letter to the claimants, inclosing the specie invoice of these hides, in which he said: "Hides

in this market are generally bought in gold, but the custom house regulations of the United States requiring all invoices from Buenos Ayres to be made out in paper currency, we always accompany each shipment with a certified invoice reduced to paper, corresponding in value to the cost of the merchandise in hard money." It was admitted that the amount of paper money stated in the invoice as the cost of the hides was the exact equivalent of the doubloons actually paid for these hides at the market rate of doubloons to paper on that day.

The government introduced evidence tending to show that the consul had never refused to certify to specie invoices of exports from Buenos Ayres; that no such certificates had ever been required at the custom house; and that, prior to the entry of these goods, no entry had ever been made of an invoice of dry ox and cow hides from Buenos Ayres, in which the cost was stated and the transaction represented in paper alone, and the actual coin used in payment wholly suppressed.

R. H. Dana, Jr., U. S. Atty., and T. K. Lothrop, for the United States.

Wm. M. Evarts, C. L. Woodbury, and M. E. Ingalls, for claimants.

LOWELL, District Judge (charging jury). The law intends that the invoice, by which goods, purchased abroad and imported into the United States and subject to an ad valorem duty, are entered at the custom house, should state accurately the true transaction between the buyer and the seller; and, as part of this statement, that it should be made out in the currency in which the purchase was made, if that is a currency of the country from which the goods are imported; and the statement of the currency in an invoice of such goods is, by intendment of law, a statement that the goods were purchased in that currency, it being a currency of the country.

If the invoice is made out in a currency different from that of the purchase, and that mode of statement would, by the usages of the treasury officers, be likely to result in a payment of less duties than would have been lawfully exacted by the statement of the currency actually used; and the merchant makes out the invoice with the knowledge of this result, and with the design and for the purpose by that mode of statement to obtain this result, then the invoice is falsely made up under the fourth section of the act of May 28, 1830 [4 Stat. 410], although the currency actually used is another currency of the same place or country, and although the statement is an equivalent statement to a person acquainted with the relative values of the currencies. If in this case the invoice was so made up, with such purpose and intent by the agent of the claimants, and entry of the goods was made upon that invoice by the claimants, their innocence of the purpose and result will not prevent a forfeiture, but will

be proper evidence to be weighed by the jury in considering the intent and design of the entire transaction.

The fourth section of the act of May 28, 1830, so far as the points involved in this case are concerned, applies to invoices of goods imported in bulk, as well as to goods imported in packages, and to an entry for warehouse as well as to an entry for consumption. If any appraisement is necessary in case of an invoice falsely made out with intent to evade the duties under the fourth section of this act, the appraisement in this case is sufficient.

If the jury find that doubloons were in common use at Buenos Ayres, at the time of this purchase, as a medium of purchase and sale, between merchants of Buenos Ayres, and between such merchants and traders from the interior provinces of the Argentine republic (of which Buenos Ayres is one), and in which accounts were often kept by merchants and bankers, then the jury may properly find that doubloons were a currency of the country within the meaning of the act of March 3, 1801 [2 Stat. 121], although the paper money of the province of Buenos Ayres was also in common use in that province, in purchases and sales, and was a legal tender in that province; and although the doubloon was not of the coinage of Buenos Ayres or of the Argentine republic.

If the jury find that invoices in doubloons were in fact sent forward by the consul without any certificate of the value of the doubloon, and were accepted at our custom houses at a rate satisfactory to our officers and nearer the true value of our money than were the paper invoices as reduced by the consul's certificate, that practice is to be considered, for the purposes of this case, to have been a lawful practice, and would be binding on Folmar, if he was aware of it; and if, knowing of this difference, he made out the invoice as he did, for the purpose of taking advantage of it, and thereby evading duties, his action would be within the statute.

If the jury find that Mr. Folmar did not make out the invoice for the purpose of evading the duties, as above explained, but for another and different purpose, then the goods are not liable to forfeiture. For instance, if he honestly believed, after due inquiry, whether of our consul or of other persons likely to be informed upon the subject, including his partner in New York, that our custom house regulations required the invoice to be made out in paper; and he in good faith made it out in order to meet that supposed requirement, then the goods would not be liable to forfeiture, although he knew that by that mode a less duty would be paid than by some other mode, which he thought inadmissible, and though no such regulation in fact existed.

On this issue, the burden of proof is on the claimants,—that is, they are to show what the transaction really was. Whichever party has made out his case by the preponderance of the evidence will be entitled to the verdict.

If the evidence appears entirely equal on each side, the government must prevail. Very few cases are decided by the burden of proof, because the jury usually finds that one side or the other has made out the best case. There is no evidence in the case upon which the jury can find a false valuation of the goods under either of the statutes upon which this information is framed.

The jury returned a verdict for the claimants.